UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UJUNWA ADIRIEJE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:18-cv-01429-TWP-DLP |
| | ) | |
| RESCARE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on a Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendant Res-Care, Inc. ("ResCare") (Filing No. 30). Plaintiff Ujunwa Adirieje ("Adirieje") initiated this action asserting claims of disability discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"), retaliation under the ADA, and a *Frampton* claim pursuant to Indiana common law. For the following reasons, the Court must **grant** ResCare's Motion.

## I. BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Adirieje as the non-moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

ResCare is a private agency that provides Medicaid waiver services to persons with intellectual disabilities and is regulated by the Indiana Bureau of Developmental Disabilities (Filing No. 31-1 at 2). The agency provides in-home care for individuals who cannot take care of

themselves for various reasons such as being confined to a wheelchair, having bipolar disorder or speech disorders (Filing No. 31-2 at 5).

Adirieje is a resident of the State of Indiana, County of Marion, and a former employee of ResCare (Filing No. 1 at 1). She was employed by ResCare as a Direct Care Professional beginning on or about September 26, 2016, left the company—to take another job—in November 2016, and was rehired in April 2017. Near the end of January 2017, Adirieje became aware that she was pregnant through a home pregnancy test. She had an ultrasound in February or March of 2017 to confirm her pregnancy. As a Direct Support Professional, Adirieje was required to provide training, emotional support, physical support, and monitoring to individuals with developmental disabilities or other reported disorders. She was assigned to work in a group home that supported eight female clients who had various disabilities. At that time, Adirieje was also a part-time student during the day and worked at ResCare during the night. She worked at the group home from 8:00 p.m. to 8:00 a.m., seven days on and seven days off. Her direct supervisor was Markita Emery-Keifer ("Markita").

When Adirieje was rehired by ResCare in April 2017, she knew that she was pregnant and she informed three ResCare employees of her pregnancy—the woman who conducted the interview, the woman who provided the orientation, and her supervisor Markita. When she rejoined ResCare, she filled out a "personnel action form," which included a question about whether she was disabled. She left that section blank and later explained that she left the disability section blank because she "was not disabled" when she applied in April 2017. As her pregnancy progressed, it affected her ability to walk, lift, bend, and stand, and her pregnancy sometimes affected her ability to concentrate or think clearly (Filing No. 31-2 at 6, 10, 22; Filing No. 31-4).

The eight clients who Adirieje serviced resided in different rooms within the group home. They moved freely about the house and sometimes without warning would have behavior problems or might start fighting with each other. During orientation, Adirieje was informed that working in a group home with eight clients required multiple staff, and she would not be working alone. Markita also told Adirieje that she would not be working alone. However, Adirieje often found herself working alone during the night shift. On several occasions Adirieje informed Markita that she was working alone and needed her to send help, and Markita agreed that she would do so. ([Filing No. 31-2 at 6](Filing No. 31-2 at 6), 19; [Filing No. 38-4 at 1](Filing No. 38-4 at 1)).

On the morning of May 16, 2017, Adirieje was taking a client to the medication room when the client asked to call her boyfriend. Adirieje told the client she could call him but not at that moment. The client became agitated and kneed Adirieje in the stomach, and Adirieje fell to the ground. Adirieje attempted to stand up, and the client tried to jump on her. Adirieje was able to run away and call her supervisor for help. Markita informed Adirieje that she could not come to the residence and asked whether Adirieje could handle it. Adirieje replied, "[i]f I can handle it, I wouldn't be calling you." ([Filing No. 38-1 at 10](Filing No. 38-1 at 10).) Markita instructed Adirieje to call the police, which she did, and a police officer came to the home. The officer asked Adirieje if she needed to go to the hospital, and she declined, explaining that she was not injured. *Id*. at 10–11.

Later that evening, while on her way to school, Adirieje received a phone call from Markita who asked her to stop by the home. *Id*. Markita then asked Adirieje if she would like to go to the hospital, and Adirieje again declined, explaining again that she was okay. Adirieje was asked to fill out an incident report form, so she filled out the report and indicated that she did not receive first aid and did not go to an emergency room because she had sustained no physical injuries as a result of the incident ([Filing No. 31-2 at 7](Filing No. 31-2 at 7), 11–12; [Filing No. 38-4 at 1](Filing No. 38-4 at 1)–2; [Filing No. 31-5](Filing No. 31-5)).

3

On May 17, 2017, Adirieje went to school and began feeling cramps. She called Markita while she was at school and explained that she was having cramps and wanted to go to the hospital. Markita responded, "No. I've already filled out the paper," so Adirieje replied, "okay." ([Filing No. 31-2 at 12](#).) Adirieje had never experienced cramps prior to the incident on May 16, but she felt cramps frequently after May 16. The cramps would come and go, and she would take Tylenol when she felt them. However, Adirieje cramps were not so severe that she could not go to work, go to school, or go out. *Id*. She worked her next scheduled shift the following day and never missed any work as a result of the incident. She later testified in her deposition that the incident did not affect her ability to work in any way. *Id.* at 12–13.

On May 29, 2017, Adirieje was washing dishes in the kitchen at the group home when her car alarm went off. She looked out the window and saw a man running away, so she called 911. The police came but could not find anyone. Adirieje called Markita to let her know what happened. She then contacted Jeff Rubin, ResCare's Indianapolis executive director, through an electronic communication application called "RedeApp." ([Filing No. 31-2 at 13](#).) Her message stated,

> Hi Jeff, good morning, my name is Ujunwa Adirieje. I work at Allisonville with 8 clients by myself overnight. Today an armed robber attacked my car and tried to force the door to the house. I am scared. I need help or I can't continue with it, it's just too much for me. Thanks.

([Filing No. 31-6](#).) Adirieje sent the message to Jeff Rubin asking for help because it was scary being at the home by herself and she was afraid of the robber ([Filing No. 31-2 at 13](#)). Jeff Rubin failed to respond to the message, and this was the only time Adirieje ever communicated with him. A few days later Markita informed Adirieje that she had learned the person who had run away was the boyfriend of a client, who came to the group home to bring cigarettes to the client ([Filing No. 31-2 at 13](#)–14).

On June 10, 2017, Adirieje arrived at the group home before 8:00 p.m. to start working her normal shift. When she learned that she would be the only staff working that night, she called Markita, who told Adirieje that she would get somebody to help soon. Adirieje began to feel unbearable cramps while she was working. She went to the bathroom and saw that she was bleeding. She then tried calling numerous other staff members to come relieve her, but they either did not answer their phone or were unable to relieve her ([Filing No. 31-2 at 14](#)).

Just before 3:00 a.m., Adirieje texted Markita: "Hi Markita, please I need help. I have been having contractions and bleeding." ([Filing No. 31-7](#).) Markita directed Adirieje to call 911. *Id*. Adirieje responded that "[n]obody will be here . . . I am here by myself." *Id*. Markita replied, "Yes they will be coming[.] I have been drinking but I will come if I have to[. I'm] just [s]cared to get pulled over[.]" *Id*. Adirieje called 911, and an ambulance arrived approximately seven minutes later. She told the ambulance crew that she had clients in the house and asked them to shut the door. Adirieje was taken to the hospital emergency room, and the doctor advised her that she had lost her baby. She was discharged from the hospital before 9:00 a.m. on June 11, 2017, with a "release to work" statement "without restrictions" on June 14, 2017 ([Filing No. 31-2 at 14](#), 15; [Filing No. 31-8](#)).

Between the time of the incidents on May 16, 2017, and June 11, 2017, Adirieje asked Markita several times for additional staffing because she was worried about her pregnancy and the abnormal cramping that had continued since May 17, 2017 ([Filing No. 38-4 at 2](#)). Adirieje returned to work on June 14, and a staff member with whom she was not familiar met her at the door. She asked Adirieje for her name, and when Adirieje said that she worked there and provided her name, the other staff member responded, "Oh, no, you can't work today. You're on suspension." ([Filing

5

No. 31-2 at 16.) Adirieje began to cry and called Markita, but Markita would not take her call. She then called the office and was placed on hold and never was able to speak to anyone. *Id.* at 16–17.

Because ResCare is regulated by the Indiana Bureau of Developmental Disabilities, whenever there is a lapse in appropriate supervision for the disabled clients, ResCare is required to investigate and report the incident to the State even if there is a justifiable reason for the lapse in supervision. When Adirieje had to go to the hospital on the morning of June 11, 2017, the eight clients at the group residence were left unattended because the staff who replaced Adirieje did not arrive until after Adirieje had been taken to the hospital. Any time an incident occurs involving a failure to provide appropriate supervision to an intellectually disabled client, ResCare is required to investigate the incident and report it to the state-regardless of whether there was a justifiable excuse for the lapse in supervision. (Filing No. 31-1 at 2).

ResCare's practice is to place the staff who was on duty at the time of a reportable incident on administrative leave while ResCare investigates the incident. In accordance with ResCare's practice, Adirieje was placed on administrative leave following the June 11 incident while ResCare conducted its investigation. On June 19, 2017, Adirieje was interviewed by a ResCare investigator and reinstated to work on June 22, 2017, with back pay (Filing No. 31-1 at 2–3; Filing No. 31-9).

On June 22, 2017, Adirieje returned to ResCare's office to obtain a letter from ResCare that she could provide to her school to explain the situation and why she would not be able to timely pay school fees. Adirieje spoke with a woman in the office, Hannah, who told her she was still investigating the incident. Hannah asked Adirieje to call her doctor to see if she could go back to work, and Adirieje responded that Hannah had just said she was still investigating. Hannah replied, "Ujunwa, calm down. Are you the first person to have a miscarriage?" (Filing No. 31-2 at 17.) When Adirieje asked Hannah if she was really speaking to her like that, Hannah said "yes,"

and Adirieje again requested a letter to provide to her school. Hannah then typed the letter and told Adirieje to take the letter and go. As Adirieje was leaving, Hannah told her that she was no longer suspended. *Id.*

After getting the letter and while driving home, Adirieje understood that she was free to return to work, but the way she had been treated by Hannah and the suspension during the investigation "broke" her, so she resigned from her employment with ResCare on June 26, 2017. *Id.* at 17–19.

On August 1, 2017, Adirieje filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") and the Indiana Civil Rights Commission. In her charge, Adirieje alleged discrimination and retaliation based on disability. In her EEOC charge, she wrote that, on May 16, 2017, she was kicked in the stomach and "was not allowed to go [to] the doctor." ([Filing No. 31-10 at 1](#).) She further stated that on June 11, 2017, she was working alone and requested help, but ResCare "refused to provide additional staff." *Id.* "She started to bleed and called her supervisor to request medical assistance. [ResCare] refused, so [Adirieje] called 911 and was transported by ambulance to the hospital where she lost her baby." *Id.* Adirieje's EEOC charge stated, "Afterwards, [ResCare] suspended [Adirieje] for leaving the house unattended in order to go to the emergency room." *Id.*

Adirieje's EEOC charge concluded, "[ResCare's] failure to accommodate [Adirieje's] disability and the decision to suspend/constructively discharge Ms. Adirieje from her employment were motivated by her disability and/or in retaliation for her complaints and requests for accommodation. These adverse employment actions, collectively and individually, were done in violation of the [ADA]." *Id.*

On May 9, 2018, Adirieje filed a Complaint in this Court, asserting claims for disability discrimination and retaliation under the ADA and an Indiana common law *Frampton* claim ([Filing No. 1](#)). She alleges, "Plaintiff was pregnant, and Defendant failed to accommodate her pregnancy/disability by refusing to fully staff the half-way house and leaving her to work alone." *Id.* at 2. Adirieje further alleges, "Plaintiff had a disability that was made known to the Defendant during her term of employment, specifically she was pregnant." *Id.* at 3. After filing an Answer to the Complaint, ResCare filed a Motion for Summary Judgment.

## II.     SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory

statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted). "In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997).

Although the Court views the designated evidence in the light most favorable to Adirieje as the non-moving party and draws all reasonable inferences in her favor, "employment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes." *Bright v. CCA*, 2013 U.S. Dist. LEXIS 162264, at *8-9, (S.D. Ind. Nov. 14, 2013).

### III.     DISCUSSION

ResCare argues that it is entitled to summary judgment because Adirieje did not suffer from a disability, did not have any pregnancy-related conditions that would qualify as a disability, and did not request a reasonable accommodation for a disability, and it could not have retaliated against her because it did not have knowledge of any disability or otherwise know that she was requesting an accommodation for an alleged disability. Regarding the *Frampton* claim, ResCare asserts it did not retaliate against Adirieje for filing a worker's compensation claim because she never filed such a claim. The Court will first address the *Frampton* claim and then turn to Adirieje's ADA claims.

A. **Count III: The *Frampton* Claim**

In Indiana, employers cannot terminate employees for exercising their rights under the worker's compensation statute (known as a *Frampton* claim). See *Frampton v. Central Indiana Gas Company, Inc.*, 287 N.E.2d 902 (Ind. Ct. App. 1972). ResCare asserts,

> Count III of Ms. Adirieje's Complaint includes a "Frampton Claim" alleging that ResCare retaliated against Ms. Adirieje based on her filing of a worker's compensation claim. Ms. Adirieje, however, testified that she never filed a worker's compensation claim related to her employment at ResCare. Moreover, ResCare never believed Ms. Adirieje filed a worker's compensation claim against ResCare, and ResCare never took any adverse employment actions against Ms. Adirieje. Therefore, ResCare could not have retaliated against Ms. Adirieje for filing a worker's compensation claim, and ResCare is entitled to summary judgment on Count III of Plaintiff's Complaint.

(Filing No. 31 at 21.)

In response, Adirieje concedes: "Plaintiff intends to waive her Frampton Claim under Count III of her Complaint." (Filing No. 38 at 13.) In light of the undisputed evidence that Adirieje did not file a worker's compensation claim, *see* Filing No. 31-2 at 5, and because Adirieje is waiving her *Frampton* claim, the Court **grants** summary judgment on Count III (the *Frampton* claim) of the Complaint.

B. **Counts I and II: The ADA Claims**

In order for a plaintiff to succeed on an ADA discrimination claim, the plaintiff must satisfy the threshold burden of establishing she was "disabled" within the meaning of the statute. *Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446, 1454 (7th Cir. 1995). An individual has a disability if: (1) she has a physical or mental impairment that substantially limits one or more major life activities; (2) she has a record of such an impairment; or (3) she is regarded as having such an impairment. 42 U.S.C. § 12102(1).

ResCare argues that Adirieje did not suffer from a disability or have pregnancy-related conditions that would qualify as a disability, and she did not request a reasonable accommodation for any disability. Relying on *Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 553 (7th Cir. 2011), ResCare explains, "[a]bsent unusual circumstances, pregnancy is not a physical impairment, and medical conditions associated with a typical pregnancy do not qualify as a disability under the ADA." Pregnancy-related complications "of a very short duration do not substantially limit major life activities absent extenuating circumstances." *Love v. First Transit, Inc.*, 2017 U.S. Dist. LEXIS 37716, at *16 (N.D. Ill. Mar. 16, 2017). ResCare asserts that summary judgment is appropriate because Adirieje's EEOC charge of discrimination, her Complaint, and her answers to interrogatories (*see* Filing No. 31-11 at 9) specifically identified "pregnancy" as her alleged disability, and the case law is clear that pregnancy is not a disability under the statute.

ResCare notes that Adirieje testified her pregnancy and pregnancy-related conditions did not affect her ability to work, and Adirieje worked her next scheduled shift the day after the incident that occurred on May 16, 2017. Adirieje testified that her cramps were not so severe that she could not go to work, go to school, or go out, and when she intermittently felt the cramps, she would take Tylenol to address them. Further, Adirieje was released to return to work without any restrictions on June 14, 2017, only three days after going to the emergency room for cramps, bleeding, and her miscarriage. ResCare asserts that the cramping, bleeding, and miscarriage that Adirieje experienced was too short in duration and not sufficiently severe to qualify as a disability under the ADA.

ResCare argues that Adirieje cannot establish a disability, so "neither [her] discrimination claim nor [her] failure to accommodate claim can proceed, as this is the first element of both claims." *Cassimy v. Bd. of Educ.*, 461 F.3d 932, 935–36 (7th Cir. 2006). They argue that her alleged

requests for accommodations cannot be considered accommodations under the ADA because the requests were not related to any disability. Adirieje's "RedeApp" message to Jeff Rubin asking for additional staff to help was sent because she was scared of a robber. Adirieje's request to go to the hospital after the May 16 incident was communicated to ResCare when she already was off work, and it was communicated after she had been asked numerous times by ResCare if she needed to go to the hospital and Adirieje had declined, stating she was fine. ResCare argues that Adirieje's unsuccessful attempts to contact coworkers to cover her shift in the middle of the night on June 11, 2017, cannot qualify as a request for accommodation from ResCare, and Markita told Adirieje via text message to call 911 and go to the hospital, so no accommodation was denied. In addition, her requests to Markita for additional staff were made because of the amount of work, not as a requested accommodation for a disability. ResCare argues that a failure to accommodate claim is simply not supported by the evidence.

ResCare further points out that Adirieje never informed anyone at ResCare that she suffered from a disability; rather, she notified ResCare that she was pregnant. ResCare had no knowledge that Adirieje suffered any disability, and it did not consider her to be disabled. Thus, ResCare could not retaliate against Adirieje for any disability or disability-related request or complaint. Finally, ResCare contends it never took adverse employment actions against Adirieje—rather, it put Adirieje on administrative leave for a short duration while it investigated the lapse in supervision over the group home residents, which was its company policy. Following the investigation, Adirieje was reinstated to her original position with back pay. Thus, there is no support in the evidence for a retaliation claim.

Responding to ResCare's arguments, Adirieje asserts that her pregnancy and pregnancy-related cramps affected several of her major life activities (lifting, bending, standing, and

concentrating), and as a result, she was disabled for purposes of the ADA. She argues that the cramping she experienced for about a month—which led to bleeding and a miscarriage—was not a symptom of a normal pregnancy, and thus, it qualified as a disability. When she asked ResCare to follow its own company policy of staffing the group home with more than one staff member, ResCare repeatedly refused to provide additional staffing to help Adirieje, which led to her being attacked by a client on May 16 and led to her suffering cramps in her pregnancy. When she asked to go to the hospital for her cramping, Markita responded "no" because the paperwork already had been filled out. She argues that her cramping was a pregnancy-related impairment separate from the symptoms of a healthy pregnancy. At about 11:00 p.m. on June 10, the cramping that Plaintiff had frequently experienced since May 16 worsened. She made several attempts to contact ResCare representatives before calling 911. ResCare's continued failure to provide additional staffing during Adirieje's night shift led to the group home residents being left alone when Adirieje was taken to the hospital for bleeding and a miscarriage, which led to Adirieje's suspension during the investigation. These facts, Adirieje argues, support a claim for the failure to provide a requested accommodation for a disability.

Adirieje asserts that she suffered an adverse employment action in retaliation for requesting and needing accommodations related to her pregnancy. After she was released to return to work after the miscarriage, she learned from a staff member who had replaced her that she was suspended for leaving the clients unattended. When Adirieje attempted to contact management for more information, no one would speak to her until she requested a letter for her school. When Hannah was providing the letter to Adirieje, Hannah commented rudely to Adirieje that she was not the first person to have a miscarriage, and Adirieje was broken and left emotionally unable to return to such a working environment; thus, Adirieje asserts, she was constructively discharged.

She argues her suspension and constructive discharge serve as adverse employment actions in retaliation for her requests for accommodation.

Adirieje notes that ResCare has not alleged that she failed to meet its legitimate employment expectations and asserts that similarly-situated non-disabled employees were treated more favorably. She was told that working in a group home with eight clients required multiple staff and she would not be working alone. Other ResCare employees—Ashley and Jasmine—worked together at the same group home and were never left to work alone. Although Jasmine was also pregnant, there is no evidence that her pregnancy was not a healthy pregnancy. Adirieje argues she was denied the accommodation that she would not have to work alone—despite the assurance made to her on numerous occasions and never delivered.

The ADA requires a threshold showing of "disability," which requires a physical or mental impairment that substantially limits one or more major life activities, a record of such an impairment, or being regarded as having such an impairment. *See* 42 U.S.C. § 12102(1). The EEOC's regulations define "physical or mental impairment" as "any physiological disorder or condition" that affects "one or more body systems . . . ." 29 C.F.R. § 1630.2(h)(1). The Appendix to the EEOC's regulations provides interpretive guidance, and this guidance specifically excludes "pregnancy" as a physical impairment that could constitute a disability. The guidance explains that, while "a pregnancy-related impairment that substantially limits a major life activity is a disability under the first prong of the definition," "conditions, such as pregnancy, that are not the result of a physiological disorder are also not impairments." 29 C.F.R. PART 1630 APPENDIX. As the Seventh Circuit explained, "[c]ourts that consider these regulations consistently find that pregnancy, absent unusual circumstances, is not a physical impairment." *Serednyj*, 656 F.3d at 553.

The Seventh Circuit further explained,

> [C]ourts generally find that short-term, temporary restrictions, with little or no long-term impact, are not substantially limiting and do not render a person disabled for purposes of the ADA. *See* 29 C.F.R. Pt. 1630, App. § 1630.2(j) ("Temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities. Such impairments may include, but are not limited to, broken limbs, sprained joints, concussions, appendicitis, and influenza."); *Waggoner v. Olin Corp.*, 169 F.3d 481, 484 (7th Cir. 1999) ("Disability does not include temporary medical conditions."); *Hamm v. Runyon*, 51 F.3d 721, 725 (7th Cir. 1995) ("Under the ADA, '[i]ntermittent, episodic impairments are not disabilities.'" (quoting *Vande Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538, 544 (7th Cir. 1995))).

*Id.* at 554.

Adirieje's claim-defining papers—her EEOC charge of discrimination, her Complaint, and her answers to interrogatories—all specifically identified "pregnancy" as her alleged disability. The case law and the EEOC's regulations and interpretive guidance are clear that pregnancy is not a disability for purposes of the ADA absent unusual circumstances. Defining what constitutes an "unusual circumstance" arising out of a pregnancy has been the subject of many district court decisions. *See Serednyj*, 656 F.3d at 540. The most persuasive decisions draw a distinction between a normal, uncomplicated pregnancy, and an abnormal one—*i.e.*, one with a complication or condition arising out of, but distinguishable from, the pregnancy. *See Gabriel v. City of Chi.*, 9 F. Supp. 2d 974, 981 (N.D. Ill. 1998); *Darian v. Univ. of Mass.*, 980 F. Supp. 77, 87 (D. Mass. 1997); *Hernandez v. City of Hartford*, 959 F. Supp. 125, 130 (D. Conn. 1997); *Cerrato v. Durham*, 941 F. Supp. 388, 392 (S.D.N.Y. 1996). In *Hernandez,* the district court defined "physiologic" as "characteristic of or conforming to the normal functioning or state of the body or a tissue or organ," and concluded that "a physiological disorder is an abnormal functioning of the body or a tissue or organ." *Hernandez*, 959 F. Supp. at 130 (quoting Dorland's Medical Dictionary (27th ed.1988)). Citing the American Medical Association's Council on Scientific Affairs, the district court gave

examples of pregnancy-related conditions that "'may be disabling for further work.'" *Id.* (quoting *Cerrato*, 941 F. Supp. at 393). Among those complications were the "'premature rupture of membranes, vaginal bleeding, . . . risk of premature [birth] . . . and a number of others.'" *Id.* Applying these definitions to this case, genuine issues of material fact remain as to whether the cramping Adirieje experienced for about a month—which led to bleeding and a miscarriage—was a symptom of a normal pregnancy.

However, even if Adirieje had a pregnancy related complication, the designated evidence leads to the conclusion that Adirieje was not disabled for purposes of the ADA because there is no evidence that her cramps limited her ability to work or other major life activities. "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). Adirieje was injured when a client kneed her in the stomach on May 16, 2017. She returned to work the following day and did not miss any shifts as a result of the injury. She never went to the hospital for this incident. Adirieje testified that her cramping was intermittent, she took only Tylenol for the cramping, and the cramping was not severe enough to prevent her from working, going to school, or going out. Adirieje has not alleged any occasions where she was unable to lift, bend, stand or concentrate, due to any injury or pregnancy complication.

When she began experiencing unbearable cramps around midnight on June 11, 2017, she went to the hospital and spent approximately six hours there to address bleeding and her miscarriage. She was released to return to work without any restrictions three days after the hospital visit. Adirieje's cramping did not limit her major life activities, and thus, it is not considered a disability for purposes of the ADA.

Adirieje's failure to accommodate claim is not supported by the evidence. Although Adirieje eventually made a request to go to the hospital after the May 16 incident, that request was communicated to ResCare when she already was off work, and going to the hospital on her own time would not require an accommodation from work. Her "RedeApp" message to Jeff Rubin asking for additional staff to help was sent because she was afraid of a potential burglar or robber and was not related to a disability. Her numerous requests to Markita for additional staff were made because of the amount of work, not as a requested accommodation for a disability. Adirieje's employer knew that she was pregnant; however, Adirieje never informed anyone at ResCare that she suffered from a disability, and ResCare had no knowledge that she suffered from a disability.

Finally, the Court agrees with ResCare that Adirieje has not demonstrated the "adverse employment action" element of her claims for ADA discrimination or retaliation. The suspension pending investigation was pursuant to policy because the group home residents were left unattended. Following investigation, Adirieje was reinstated to work with backpay. ResCare's lack of empathy following Adirieje's late term miscarriage and their failure to explain in advance the policy of suspension for leaving the home unattended (especially considering these unfortunate circumstances), was certainly harsh and insensitive. However, the designated evidence does not support the conclusion that Adirieje suffered from a disability as defined under the ADA or was discriminated and retaliated against.

Accordingly, Adirieje's claims for disability discrimination, retaliation, and failure to accommodate must be dismissed, and ResCare is entitled to summary judgment.

## IV. CONCLUSION

For the reasons stated above, Defendant Res-Care, Inc.'s Motion for Summary Judgment is **GRANTED** ([Filing No. 30](#)). Plaintiff Ujunwa Adirieje's claims are dismissed, and the jury trial is vacated. Final judgment will issue under separate order.

**SO ORDERED.**

Date: 9/30/2019

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Paul J. Cummings
HENN HAWORTH CUMMINGS & PAGE
Paul.Cummings@HHCFirm.com

William F. English
NAPIER GAULT SCHUPBACH & STEVENS PLC
wenglish@napiergaultlaw.com

David M. Henn
HENN HAWORTH CUMMINGS & PAGE
david.henn@HHCFirm.com

Clay M. Stevens
NAPIER GAULT SCHUPBACH & STEVENS PLC
cstevens@napiergaultlaw.com